UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-mj-142 (SGE)

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| ) | |
| Plaintiff,  ) | **GOVERNMENT'S MOTION TO** |
| ) | **REOPEN DETENTION HEARING** |
| v.  ) | **AND TO DETAIN DEFENDANT** |
| ) | |
| JUSTIN DAVID EICHORN,  ) | |
| ) | |
| Defendant.  ) | |

The United States of America, by and through its attorneys, Lisa D. Kirkpatrick, Acting United States Attorney for the District of Minnesota, and Daniel W. Bobier, Assistant United States Attorney, pursuant to 18 U.S.C. §§ 3142 and 3145, hereby moves the Court to: (1) reopen the detention hearing in this matter on the basis of new, material information not known to the government at the time of the original hearing; (2) rescind the Court's order contemplating the defendant's pretrial release, currently anticipated to occur on March 25, 2025, to a halfway house; and (3) order the defendant detained until trial, on the bases that his release poses a serious risk of flight, of danger to the community, and that, if released, he will attempt to obstruct justice.

As described below, in the three days since Eichorn's initial appearance, the government has learned substantial additional facts that directly bear on the prudence of his pretrial release. Those facts provide at least three grounds, each independently sufficient, to detain Eichorn. Those grounds are: (1) Eichorn lied to the Court about his access to firearms; (2) Eichorn apparently orchestrated an effort to

retrieve a computer from his St. Paul apartment to deprive investigators of the opportunity to examine it; and (3) Eichorn kept with that computer an iPhone that FBI agents found in a recently "factory reset" condition, suggesting that someone with access to the phone's accounts attempted to wipe it.

This motion is based upon the below memorandum of points and authorities and any other evidence or argument that the Court may wish to consider.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Investigation Leading to Eichorn's Arrest and Federal Charge

The defendant Justin Eichorn was arrested as part of a sting operation designed to identify and apprehend people engaged in buying commercial sex from minors. That investigation was undertaken by the Bloomington Police Department. Bloomington officers placed online advertisements for commercial sex and then manned the phone numbers provided in those ads. Many of those ads included variations of the same language:

> cum $pend time with me […] Age: 18 I am: A woman I see: Men only. Hi I'm [fictitious name] ready to plz I do both and incall[1] only [covert law enforcement telephone number] City: Minneapolis, MN Name: [name] Location: Bloomington.

On or about March 11, 2025, the undercover law enforcement phone number used in those ads received text messages from a person later determined to be Eichorn.[2] Eichorn's messages included, "Hey [fictitious name] I saw your post and

---

[1] In this context, the term "incall" is meant to convey that clients are expected to come to the location of the female to engage in commercial sex.

[2] Eichorn used a number assigned to a VoIP service provider, which is an Internet-based application to send and receive communications.

[sic] chance you are still available tonight?" and later, "What's a guy gota do to get with the hottest girl online tonight."

On or about March 12, 2025, Eichorn again contacted that number, asking if the undercover was "available today." An undercover law enforcement officer (the "UC") responded, "hey baby i am." Eichorn replied, "Awesome where ya at and what's your rates."

Also on March 12, Eichorn asked, "Qv[3] or hhr how old are you." The UC responded: "kinda nervous 2 say," and then (purportedly) revealed, a few texts later, "im 17 sry don't want u 2 b mad."

The communications continued on March 12 and March 13, 2025. However, no plans were yet set because officers were handling other suspects at the time. Messages sent during this time included discussion of the undercover's "rates," her supposed age, and sex acts.

On or about March 13, 2025, after again inquiring about the undercover officer's age, Eichorn wrote, "Ok will ya send me a naught pic of you to show me your real?" The undercover officer responded, "whats naughty 2 u?" Eichorn replied, "You decide." The undercover officer sent a photo depicting a clothed female's cleavage. Eichorn continued, "Got anything with lot less clothes?"

---

[3] "Qv" likely refers to "quick visit" or an appointment lasting approximately 15 minutes or less.

3

On March 17, 2025, Eichorn again contacted the undercover law enforcement phone number. Eichorn asked, "Hey what's up are you available today?" The following interaction, in part, occurred:[4]

> UC: Hey babe
>
> Eichorn: Hey I would still like to find a way to meet ya and both feel comfortable where ya located today and would ya be open to doing an outcall[5]
>
> UC: I am available baby. I have a private discreet place in Bloomington. I only do outcall after the first date.
>
> UC: Yes we could do that.....I'm sorry babe my phone has been super busy and we hadnt talked for awhile....how long are you looking to spend?
>
> Eichorn: Qv or half hour
>
> UC: $80qv or $120hh[6]
>
> Eichorn: Ok and what's exactly do ya offer at that rate ?
>
> UC: FS.[7] No greek[8] and bare[9] is extra.
>
> Eichorn: Ok how much extra?
>
> UC: $25
>
> Eichorn: Ok what's your address I'll see if I can get there.

---

[4] This transcript of messages is based on a draft transcript provided by Bloomington police. It is subject to revision, however based on currently available information, the government believes it is substantively accurate.

[5] The term "outcall" in this context likely refers to a service where the service provider travels to the client's location to provide services. In the context of commercial sex, an outcall would have the female traveling to the paying party for sex.

[6] This likely means that the UC was charging $80 for 15 minutes or less and $120 for a half hour visit.

[7] "Full service" or sexual intercourse.

[8] In this context, the term "greek" is a reference to anal sex.

[9] In this context, "bare" is short for "bareback," also known as sexual intercourse without prophylactic protection such as a condom.

During this interaction, Eichorn identified himself as a 38-year-old [10] white male. The UC reintroduced the topic of the UC's purported age:

> UC: A lil younger than my ad….is that ok? I just wanna have fun and no drama babe
>
> Eichorn: Sure I don't know what your ad says cuz I don't have it up anymore but as long as your legal age I am fine
>
> UC: I am 17…like I said don't want any drama but wanna be upfront cause one guy got hella mad at me
>
> Eichorn: Why was he so mad? I think age of consent is 17 when do ya turn 18?
>
> UC: Idk [11] lol he was a creep anyway. I don't turn 18 till December
>
> Eichorn: It's says age of consent is 16 …… over 18 is in a position of authority over you like a teacher or friends parent

Around this point in the communications, law enforcement provided Eichorn with the address where the law enforcement operation was set to occur. The message communication continued, and about half an hour later, Eichorn asked the undercover—again, whom Eichorn had been told was younger than 18—to send him a "sexy pic":

> UC: Do you wanna cum hun? Otherwise I am gonna make different plans.
>
> Eichorn: Yes I would like to can I have a sexy pic of you to feel comfortable coming maybe even just topless waist up is fine.
>
> UC: I can give you a sexy photo but I don't do nudes…I don't wanna get my stuff spread all over the internet.
>
> Eichorn: OK how about a pic in just your bra and underwear holding up 2 fingers

---

[10] Eichorn is in fact 40 years old.
[11] Shorthand for: "I don't know."

A few messages later, within about 20 minutes, the undercover sent Eichorn a photo showing a female, wearing a bra and no shirt, with exposed cleavage. Part of her face is visible, and she is holding up two fingers.

The text message communications continued after the undercover sent that photo:

Eichorn: Was hoping for a more full body shot but Hot you look in your 20's

UC: Says the guy who won't send me any photos lol…awfully demanding. Sorry my photo isn't good enough. **I can assure you I am 17**. If you aren't interested…bye

Eichorn: **I am interested on the way** just trying to be comfortable.

The undercover officer then messaged Eichorn a photo showing a map of the area and indicated on the map where Eichorn should park. Thereafter, Eichorn wrote, "Just pulling in come out what are ya wearing I'll look for you." An interaction followed in which Eichorn stated he had arrived at the designated spot. Law enforcement then observed a white Toyota Tundra[12] back into a parking spot in the area designated in the image sent earlier by the undercover. Law enforcement observed a white male wearing a black shirt get out of the truck and walk around the lot on his phone. In a text message, the UC asked, "is that you walking in the black shirt?" Eichorn replied, "ya."

At approximately that point, marked law enforcement officers approached the man walking around the lot. The man was seen manipulating his phone and

___
[12] The truck bore Minnesota license KGW529. According to the Minnesota Department of Public Safety, Driver and Vehicle Services, this vehicle is registered to Eichorn.

discarding it in his vehicle as marked squads approached. Police arrested that man—identified to be Eichorn.

Bloomington police towed Eichorn's truck. During an inventory search of the truck, police located—among other things—two Apple iPhones, an unopened Trojan brand condom in the driver side door, $105 cash in the driver side door handle, and $24 cash in the center console.

Eichorn was charged under state law and then, on March 19, charged via federal complaint for attempted enticement of a minor in violation of 18 U.S.C. § 2422(b). Eichorn has been in custody since his March 17 arrest.

## II.    Eichorn's Initial Appearance and the Court's Detention Determination

Eichorn made his initial appearance in federal court on March 20, 2025. For the purposes of that appearance, the pretrial services office had interviewed Eichorn and then prepared a report. That report indicated that Eichorn lived for much of the year in his family home in Grand Rapids, Minnesota, with his wife and children, but that, since 2017, he has spent the months of January through May living in an apartment in St. Paul—presumably to be closer to the state capitol so he could be present there to carry out work in his former role as a state Senator.

The report further indicated that Eichorn "advised he previously possessed one firearm that was removed from the [Grand Rapids] home." The report continued: "However, Eichorn does not recall when the firearm was removed. Alternatively, Eichorn advised he can reside alone at his rental apartment as the lease is set to expire in December 2025." The report did not specify whether Eichorn kept any

firearms in the St. Paul apartment, but the undersigned has spoken with the pretrial services officer that conducted the interview with Eichorn; she confirms that Eichorn stated in the interview that there was <u>no</u> firearm in the St. Paul apartment.

At the March 20 appearance before the Court, the government noted that, given Eichorn's charge, the law provides a presumption in favor of detention—in other words, a presumption that no combination of conditions of release can reasonably assure the defendant's reappearance and the safety of the community. *See* 18 U.S.C. §§ 3142(f)(2-3). That presumption can only be rebutted if the Court finds clear and convincing evidence to the contrary. The government stated at the hearing that that presumption could not be rebutted here but that, if the Court were inclined to release Eichorn to a halfway house subject to the conditions proposed in the pretrial services report, the government would agree. The Court so ordered Eichorn's release. As of March 23, Eichorn remains incarcerated at Sherburne County Jail. Consistent with the Court's March 20 order, Eichorn is set to be released to a halfway house as soon as a bed becomes available. Dkt. 7 at 6. The government understands that said release is scheduled for Tuesday, March 25.

## III.   The Government Has Learned New and Material Facts Necessitating Reopening of the Detention Hearing

Since Eichorn's initial appearance and the Court's detention order on March 20, the government has learned new facts about Eichorn, his conduct since his arrest, and his apparent deception of the Court. The government learned these facts from jail calls between Eichorn and a close, known associate of his, Individual A, and

from executing a warranted search of Eichorn's St. Paul apartment on March 21. Those facts are summarized below.

### A. March 19, 2025, Jail Call Between Eichorn and Individual A

This call begins with over a minute of standard recorded language advising the caller that the phone call is not private and is recorded. Once Eichorn and Individual A are actually connected, they begin a conversation. Within the first 20 seconds of that conversation, Eichorn advises Individual A: "Just remember this is not like uh, a secure line, so just basic stuff."

A few minutes into the call, the following exchange takes place:

Indiv. A.: "My big question is (unintelligible) is your computer in your truck?"[13]

Eichorn: "No."

<cross talk>

Indiv. A: "That's an easy – no. Okay. Okay."

Eichorn: "Speaking of that, they did take both the phones that were in my vehicle. Obviously they –"

Indiv. A: "I know I already, I already, yup, I know."

Eichorn: "Okay. So, you are on the account for AT&T –"

Indiv. A: "Already taken care of."

Eichorn: "What do you mean? Did you get me a new phone already or did you Do the apartment one?"

Indiv. A: "Apartment."

Eichorn: "Okay, so you, you have a phone to do apartment stuff."

---

[13] As described above, Eichorn drove himself in a truck to the scene of his arrest. Upon his arrest, law enforcement towed that vehicle.

Indiv. A: "Yup."

Eichorn: "Have you –"

Indiv. A: "Already taken care of."

[…]

A few minutes later into this call, the pair again discuss the subject of phones:

Eichorn: "So as far as phones go when I get out obviously I'll have to go to an AT&T to get my number restarted and I might want a different phone number even though –"

Indiv. A: "That is, that is the reason I didn't get you one, I wanted to verify"

Eichorn: "So, the number I gave them I think I'll have to keep it. Um, but I might want to get a second"

Indiv. A: "A new –"

Eichorn: "A different one and start switching to that and then once all the court stuff is done just not use the 5234 number anymore and just be completely done."

Indiv. A: "Ok."

## B. March 20, 2025, Jail Call Between Eichorn and Individual A

Eichorn and Individual A engaged in other jail calls in the days following his arrest. One of those calls, from March 20, is reproduced in part below:

Indiv. A: "Apartment stuff is taken care of, just so you know."

Eichorn: "You're handling all of it. There might be a lease or two that needs to be printed but I mean that's something that once I'm at the next place I can tell you what to do and you can give it to Amy to be printed. Then we can -- "

Indiv. A: "I was hoping so because we have one for the 24th. So."

Eichorn: "Yes. So we can do that I can tell you how to create one, um."

10

Indiv. A: "Well I remember most of it. But yes if you were gonna …"

[*cross talk*]

Indiv. A: "Be there tomorrow and eventually you can walk me through over the weekend that would be great."

Eichorn: "You don't even need—you can just use – if you have your computer, you don't even need the apartment one. Because it's all online. And then – "

[*cross talk*]

Indiv. A: "Well there are other, I mean. I still want to go pick it up um. Tomorrow, so. I, I have a ride, I have a ride to pick it up and people to be with the kids tomorrow."

Eichorn: "OK. Did Taylor talk to you about going there?"

Indiv. A: "Yes."

Eichorn: "Ok, perfect."

Eichorn: "One more thing, um, when they got me they broke my my ring. Uh, there should be an extra one there, cause I have the extra one in my bag. It might, it's either in the bathroom or on the counter by my red bag. If you're willing to get that for me I would so like to have that if if it's ok."

Indiv. A: "Ok."

Eichorn: "Are you ok with that? If you're not you should just leave it there."

Indiv. A: "I will grab whatever you need me to grab."

## C. FBI Findings Upon the Warranted Search of Eichorn's St. Paul Apartment

On the morning of March 21, 2025, law enforcement obtained a warrant authorizing the search of Eichorn's St. Paul apartment for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 18 U.S.C. §§ 2422(b) (attempted enticement of a minor), 2251(a) and (e) (actual or attempted production of child pornography), 2252A(a)(2) and (b)(1) (actual or attempted receipt

11

CASE 0:25-mj-00142-SGE    Doc. 12    Filed 03/23/25    Page 12 of 22

or distribution of child pornography), and/or 2252A(a)(5)(B) and (b)(2) (actual or attempted possession of child pornography).

That same morning, while law enforcement was orchestrating FBI personnel to execute that warrant, investigators dispatched two FBI agents to wait outside Eichorn's St. Paul apartment and "freeze the scene." At approximately 9:50 am, those FBI agents encountered Individual A, who arrived on the scene and asked to be allowed to enter the apartment. FBI agents told her she could not enter, but Individual A asked whether she could retrieve a computer from the apartment, which she said was used for her business. When FBI agents declined, Individual A left. A few minutes later, the case agent from the FBI called Individual A and asked that she return to the apartment building to be interviewed. She asked whether she was "legally required to," and when the case agent responded that she was not, she declined.

Within hours, law enforcement executed the search warrant at Eichorn's apartment. In doing so, FBI agents found, among other things, a red bag sitting on a counter in the apartment. Inside the bag, officers found $1,000 in cash, a handgun and ammunition, a laptop computer, an SD memory card, an Apple iPhone, and several of Eichorn's state Senate business cards. Agents found other devices in the apartment, but the laptop found inside the red bag was the only computer. The Apple iPhone found in the red bag appeared to have been reset to factory settings, which can cause all content on the phone to the erased. On many iPhones, such "factory

resets" can be accomplished remotely by any person with the proper account login

information. Investigation into these devices is ongoing.



*Red bag, depicted as found (above); computer found in red bag (below)*



 

*iPhone found in red bag (left); gun and ammunition found in red bag (right)[14]*

## <u>ARGUMENT</u>

Title 18, United States Code, Section 3142(f)(1)-(2) identifies when the Court must hold a detention hearing, which includes and is not limited to cases involving crimes of violence and/or any felony offense (that is not otherwise a crime of violence) with a minor victim. *See* 18 U.S.C. §§ 3142(f)(1)(A), (E). Further, under Section 3142(f)(2)(B), the Court shall hold a detention hearing upon government motion in any case involving a serious risk that the defendant will obstruct, or attempt to obstruct, justice. In this case, 18 U.S.C. 3142(e)(3)(E) establishes a rebuttable presumption that no condition or

---

[14] The timestamp on the camera used to take these photos, and the photos on the previous page, was set for CST not CDT, so each is an hour behind actual time.

14

combination of conditions will reasonably assure Eichorn's reappearance and the safety of the community.

In a presumption case, "a defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence he does not pose a danger to the community or a risk of flight." *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003) (cleaned up).

Should the defendant meet this burden of production as to both factors, the Court still must analyze whether detention is warranted. In that analysis, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Id.* And in such circumstances, the Court "shall [also] take into account the available information" regarding:

(1)     the nature and circumstances of the offense charged, including whether the offense … involves a minor victim;

(2)     the weight of the evidence against the [defendant];

(3)     the history and characteristics of the [defendant], including—

    (A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). After weighing such factors—again, assuming the defendant managed in the first instance to rebut the presumption in favor of detention—the Court must order pretrial detention upon either: (1) a clear and convincing showing that release will result in a danger to the community or (2) a showing by a preponderance of the evidence that release will result in a serious risk of flight. *See Abad*, 350 F.3d at 797; *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986).

## I.    The Court Should Reopen the Detention Hearing on the Basis of New, Material Information and Should Order Eichorn Detained

Section 3142(f)(2) provides that a detention hearing may be reopened, whether before or after the initial determination by the Court, "at any time" if the Court finds "that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2).

Such is the case here. In the three days since Eichorn's initial appearance, the government has learned substantial additional facts that directly bear on the prudence of his pretrial release. As described below, these facts provide at least three grounds, each independently sufficient, to detain Eichorn. Those grounds are: (1) Eichorn lied to the Court about his access to firearms; (2) Eichorn apparently orchestrated an effort to retrieve a computer from his St. Paul apartment to deprive investigators of the opportunity to examine it; and (3) Eichorn kept with that computer an iPhone that FBI agents found in a recently "factory reset" condition, suggesting that someone with access to the phone's accounts attempted to wipe it.

16

### A.  Eichorn Lied to the Court About His Access to Firearms

Eichorn told this Court—through pretrial services—that he does not have any firearms in his St. Paul apartment. He then proposed that, should he be released, he could reside in that very apartment. He lied.

When the FBI searched Eichorn's St. Paul apartment on March 21, the day after he told the Court he kept that space free of guns, the FBI found a handgun and ammunition. To be clear, this handgun was not some forgotten weapon stored away in a dusty shoebox. FBI agents found the gun on Eichorn's kitchen counter, within the same red bag that Eichorn had described to Individual A in a jail call just the day before. That red bag also contained the laptop that Eichorn and Individual A repeatedly discussed and planned to quickly retrieve from the apartment. In short, Eichorn knew that red bag was in his apartment (of which he is the sole resident). He knew it contained a gun and ammunition, but when pretrial services asked if he had a firearm in that apartment, he lied.

This alone is enough to detain Eichorn. Permitting defendants released pending trial to retain access to firearms poses significant dangers to the community. Those can include dangers to law enforcement, should the defendant try to abscond and law enforcement try to stop him, and to the defendant himself. It is for that reason that pretrial services almost always recommends that release conditions include refraining from accessing firearms. It is for that reason (among others) that the Court ordered such condition here. Dkt. 7 at 3. Eichorn's conduct evidences a willingness to conceal material facts from the Court and to do so at the expense of

public safety. Even more concerning, given his and Individual A's prompt attempt to clear out the St. Paul apartment, is the possibility that Eichorn lied because he thought his associate could clear out the apartment before pretrial services or law enforcement could get there. For this reason alone, he should be detained.

## B. Eichorn Attempted to Retrieve His Computer from the St. Paul Apartment Before Law Enforcement Could Access It

Eichorn was charged after he used one or more devices to communicate with, and attempt to meet for commercial sex, a girl that he believed to be a minor. The unsealed Complaint in his case makes clear that Eichorn's use of digital devices is a central part of this investigation. In this, as in nearly all child sex investigations, it is critical that law enforcement identify and access as many of the defendant's digital devices that may have been used in the offense as possible.

Even so, Eichorn almost immediately after his arrest began discussing with Individual A plans for her to travel to Eichorn's apartment in St. Paul to retrieve certain items, including a computer. On March 21, Individual A executed on the plan to retrieve that computer. She got a ride to the St. Paul apartment, attempted to enter it, and, when rebuffed by the FBI, asked that she be allowed to retrieve the computer from within the apartment. The government does not know from where Individual A set out that morning, but it is worth noting that Individual A resides in Grand Rapids—approximately three hours from St. Paul—and yet she arrived on scene before 10 a.m.

These facts give the government, and should give the Court, serious concern that Eichorn may be attempting to obstruct the ongoing investigation into his

18

conduct. Eichorn was arrested on March 17. Two days later, he was charged by federal complaint with attempting to entice a minor for commercial sex. That charge carries a mandatory minimum sentence of 10 years. His arrest and charge quickly garnered national attention. On March 20, he resigned from the Senate seat he has held since January 2017. Yet in the midst of these seismic events in his life, one of his and Individual A's top priorities was the retrieval of a laptop computer from Eichorn's apartment, some three hours from his family home. To be clear, the government does not yet know what, if any, evidence may be found on that device. But these events seriously trouble the government and appear plainly to be obstructive. This conduct, too, is enough on its own to warrant detention.

### C. Eichorn's "Red Bag" Contained a Factory Reset iPhone

The FBI found in the same red bag that contained the computer that Eichorn and Individual A attempted to swiftly recover an iPhone that appears to have been reset to factory settings. Initial forensic analysis suggests that reset may have occurred prior to Eichorn's arrest, but that analysis is not yet complete and the timing of this reset has not yet been confirmed. Because the government cannot yet rule out that this phone was reset post-arrest and remotely, the government is concerned—especially in light of Eichorn and Individual A's other communications and conduct—that this phone may have been wiped in an attempt to preclude law enforcement from reviewing its contents.

### D. Detention Is Warranted

On the basis of these new and material facts, the government submits that the Court should reopen the detention hearing and order Eichorn detained. Eichorn's post-arrest conduct, including his lie to pretrial services concerning his possession of a gun, make clear that he does not intend to be truthful or to respect legal process. Instead, his conduct strongly suggests a willingness—and actual steps taken—to frustrate the ongoing child-sex investigation into his conduct.

This is a presumption case. The government submits that the defendant cannot rebut that presumption with evidence that his release, with conditions, will reasonably assure his reappearance and the safety of the community. On the contrary, his post-arrest conduct reveals a willingness to mislead, to frustrate the government's investigation, and to preserve his pretrial access to firearms.

Given those facts, the 3142(g) factors weigh heavily in favor of detention. Eichorn is charged with attempting to solicit a minor for sex (factor (1), nature of offense); the weight against him is significant, especially given the text messages he exchanged with the undercover in which she repeatedly advised him that she was a minor, and yet he confirmed he was still "interested" in purchasing commercial sex from her (factor (2), weight of the evidence); his post-arrest conduct evidences a disrespect for legal process and willingness to deceive the Court (factor (3), character and past conduct); and his attempted predation of a child and willingness to lie to preserve his access to firearms signals significant community-danger concerns (factor (4), community danger).

20

Moreover, the community-danger factor also supports detention given Eichorn's clear familiarity with soliciting commercial sex from minors. His text messages with the undercover in this case depict someone who knows the lingo of the trade. He uses terms like "Qv" and quickly responds knowingly to the undercover's use of terms like "FS," "greek," and "bare"—all terms, defined above, that have special meaning to those engaged in sex trafficking. In one of Eichorn's first messages to the undercover, he asks, "how old are you?" He does that despite her advertisement's clear statement that she is 18—revealing that Eichorn is familiar that minors being marketed online for commercial sex often falsely advertise they are of age to avoid detection by law enforcement. Eichorn's messages and conduct reveal an experienced operator. His pretrial release brings with it a real risk that he would attempt to victimize other minors in the community.

For this, and each of the reasons described above, Eichorn should be detained.

## CONCLUSION

The government respectfully requests that the Court reopen the defendant's detention hearing and detain the defendant because no conditions will reasonably assure the safety of the community and the defendant's appearance before the Court. The government further requests that it be permitted to be heard on these issues prior to the defendant's release to a halfway house, currently scheduled for March 25.

Dated:  March 23, 2025                    Respectfully submitted,

                                          LISA D. KIRKPATRICK
                                          Acting United States Attorney

                                          */s/ Daniel W. Bobier*

                                          BY:  DANIEL W. BOBIER
                                          Assistant United States Attorney